UNITED STATES of America

v.

Amin SHABAZZ, Appellant.

UNITED STATES of America

v.

Richard McNEIL, a/k/a
Dickie, Appellant.

Nos. 90–3244, 90–3245.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 1, 1991.

Decided May 28, 1991.

---

Jensen E. Barber (appointed by the Court), with whom Diane S. Lepley (appointed by the Court) was on the joint brief, for appellants, Amin Shabazz in 90–3244 and Richard McNeil in 90–3245.

James N. Plamondon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Kathleen A. Brandon, Asst. U.S. Attys., were on the brief, for appellee.

Before SENTELLE, THOMAS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge THOMAS.

CLARENCE THOMAS, Circuit Judge:

Dilaudid is a brand-name, pharmaceutically manufactured drug prescribed as a pain killer. The active ingredient in dilaudid is hydromorphone, a substance controlled under schedule II of 21 U.S.C. § 812. *See* 21 C.F.R. § 1308.12(b)(1)(11). Amin Shabazz and Richard McNeil pleaded guilty to drug offenses involving dilaudid pills. Their sentences were calculated according to the gross weight of the dilaudid, not the net weight of the hydromorphone. They contend that these sentences are inconsistent with applicable statutes and sentencing guidelines. We disagree.

I.

Shabazz pleaded guilty to one count of conspiring to distribute dilaudid, *see* 18 U.S.C. § 371, and McNeil pleaded to one count of distributing dilaudid, *see* 21 U.S.C.

§ 841(a)(1), (b)(1)(C). Their presentence reports determined that Shabazz and McNeil were responsible for, respectively, 1358 and 147 pills of dilaudid. The reports also estimated that each pill weighed about 90 milligrams, although the pills themselves were never actually weighed. Shabazz and McNeil challenged neither of these findings. At a sentencing hearing, however, they introduced evidence that each of the pills contained only 4 milligrams of hydromorphone, a figure not disputed by the government. Thus, the parties agreed that Shabazz was responsible for a total of 122.22 grams of dilaudid containing a total of 5.432 grams of hydromorphone, and that McNeil was responsible for a total of 13.23 grams of dilaudid containing a total of .588 grams of hydromorphone. The parties disagreed over which of these figures were relevant for sentencing purposes.

Shabazz and McNeil argued that their sentences should be calculated according to the total weight of the hydromorphone. That approach would produce applicable guideline ranges of between 15 and 21 months' imprisonment for Shabazz, and between 10 and 16 months for McNeil. The government responded that the total weight of the dilaudid was properly considered, producing applicable ranges of between 51 and 63 months for Shabazz and 27 and 33 months for McNeil. The district court agreed with the government, *see United States v. Shabazz*, 750 F.Supp. 1 (D.D.C.1990), imposing a 51–month sentence on Shabazz and a 27–month sentence on McNeil.

■ Shabazz and McNeil both appealed. They contend that the district court's approach violated both 21 U.S.C. § 841(b)(1) and section 2D1.1 of the sentencing guidelines. We have jurisdiction under the Sentencing Reform Act, which permits appellate review of sentences for error of law and for misapplication of the guidelines. *See* 18 U.S.C. § 3742(a)(1), (2).

## II.

Appellants' base offense levels were determined under subsection (a)(3) of section 2D1.1 of the sentencing guidelines. That provision incorporates by reference the drug quantity table in subsection (c), which sets out offense levels for various weights of certain controlled substances. A footnote to the drug quantity table states that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." United States Sentencing Commission, *Guidelines Manual* § 2D1.1(c) n. * (Nov. 1990) [hereinafter *Guidelines*]. Hydromorphone is not listed in the drug quantity table itself, but it does appear in a drug equivalency table supplementing the drug quantity table. *See id.* § 2D1.1 application note 10. Accordingly, section 2D1.1 requires the entire weight of dilaudid to be considered, unless either (A) dilaudid is not a "mixture or substance" containing hydromorphone, or (B) another provision in the guideline "otherwise specifie[s]." Appellants make both arguments.

### A.

■ We first determine whether dilaudid is a "mixture or substance" containing hydromorphone. Application note 1 to section 2D1.1 provides that " '[m]ixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841." Section 841, in turn, defines sentencing ranges applicable to distribution offenses involving any of eight specified controlled substances according to the weight of the "mixture or substance" containing the controlled substance. *See* 21 U.S.C. § 841(b)(1)(A), (B). The statute, however, does not define the term "mixture or substance."

Virtually all of the case law interpreting the term has addressed the question whether LSD blotter paper is part of a "mixture" containing that drug. Several circuits have held that it is, primarily because "[y]ou cannot pick a grain of LSD off the surface of the paper." *United States v. Marshall*, 908 F.2d 1312, 1317 (7th Cir.) (en banc), *cert. granted sub nom. Chapman v. United States*, — U.S. —, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990); *see id.* at 1317 n. 4 (collecting cases). In *United States v.*

*Healy*, 729 F.Supp. 140 (D.D.C.1990), one district court disagreed, holding that a "mixture" is present only if its various constituents are " 'more or less evenly diffused' " among one another. *See id.* at 142 (quoting 9 *Oxford English Dictionary* 921 (1989)). *But see United States v. Yu–Chong*, 920 F.2d 594, 597 (9th Cir.1990) ("The definition of 'mixture' does not imply or require homogeneity." (citing *Random House Dictionary* 1234 (2d ed.1987))).

Appellants invite us to endorse *Healy*, but fail to contend that dilaudid is not a "mixture" under *Healy*. The government urges us to follow *Marshall* and reject *Healy*. For a definitive explication of the "mixture or substance" language, we prefer to await the Supreme Court's decision in *Chapman*. For purposes of this case, we need only observe that both the *Marshall* and the *Healy* criteria are met: "you cannot pick a grain of [hydromorphone] off the surface of [a dilaudid tablet]," and hydromorphone is "more or less evenly diffused" throughout dilaudid tablets. *See Physicians' Desk Reference* 413 (45th ed. 1991) (illustrating tablets). Given both considerations, we have no doubt that a "mixture" is present.

### B.

Alternatively, appellants argue that even if dilaudid is a "mixture or substance" containing hydromorphone, application note 11 to section 2D1.1 prohibits sentencing according to the weight of the dilaudid in this particular case. Application note 11 provides guidance on how to determine the weight of controlled substances for sentencing purposes if "the number of doses, pills, or capsules" is known, but the "weight of the controlled substance" is unknown. Its function is best understood by first reviewing how section 2D1.1 operates when the "weight of the controlled substance" is known.

Base offense levels for all distribution offenses vary according to the weight of the particular drug involved. If the relevant weight is known, then the base offense level is determined from either the drug quantity table, *see Guidelines* § 2D1.1(c), or one of the drug equivalency tables, *see id.* § 2D1.1 application note 10. The drug quantity table sets out offense levels for various weights of certain familiar controlled substances, and the drug equivalency tables provide ratios for converting weights of all other controlled substances into equivalent weights of controlled substances that appear in the drug quantity table.

With a few expressly noted exceptions, both the drug quantity table and the drug equivalency tables mete out sentences according to the weight of the mixture or substance containing the controlled substance. For example, although the drug quantity table provides increasing base offense levels for increasing weights of heroin, the accompanying note makes clear that "the weight of [the heroin] set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of [heroin]." *Id.* § 2D1.1(c) n. *. Similarly, the drug equivalency tables equate one gram of oxymorphone with five grams of heroin, and the notes accompanying these tables illustrate that the intended equivalence is between "one gram of a *substance* containing oxymorphone" and "five grams of a *substance* containing heroin." *Id.* § 2D1.1 application note 10 (emphases added). Thus, while the drug equivalency tables equate one gram of hydromorphone with 2.5 grams of heroin, the intended equivalence is clearly between one gram of a *mixture or substance* containing hydromorphone—for example, dilaudid— and 2.5 grams of a *mixture or substance* containing heroin. Had the pills at issue here been weighed, therefore, we would have no doubt that the district court properly sentenced appellants according to the total weight of the dilaudid.[1]

---

**1.** Appellants concede that oxymorphone should be weighed according to the mixture or substance in which it is found, but suggest that the oxymorphone example does not illustrate the proper treatment for all other controlled substances listed in the drug equivalency tables. We disagree. After noting that the drug quantity table provides base offense levels for only a few controlled substances, application note 10 explains that the drug equivalency tables pro-

Appellants, however, contend that application note 11 compels a different result in this case, where the total weight was determined by multiplying the number of pills involved times an *estimated* average weight per pill. To facilitate such determinations, application note 11 sets out a table listing average per-unit weights of sixteen different controlled substances. For ten of these, "the weight per unit shown is the weight of the actual controlled substance, and not generally the weight of the mixture or substance containing the controlled substance." *Id.* § 2D1.1 application note 11 n. *.[2] We will assume that for purposes of application note 11, hydromorphone, which does not appear in the table, should be treated like these ten (as opposed to the other six), although appellants offer no argument for why we should do so.

By its terms, application note 11 governs only if "the weight of the controlled substance" is "not ... known." Appellants contend that the phrase "the weight of the controlled substance" refers to the weight of the actual controlled substance, not the weight of the mixture or substance containing the controlled substance. Because we conclude that this reading is textually awkward and produces absurd results, we reject it.

As a formal matter, application note 11 is not itself part of the guidelines. Like all other application notes, it serves to "interpret the guideline[s] or explain how [they are] to be applied." *Id.* § 1B1.7. In this case, the provision interpreted is *Guidelines* § 2D1.1(c), which sets out the drug quantity table. Properly read as an interpretation of (or, perhaps more realistically, a supplement to) the drug quantity table, application note 11 itself must be construed in light of the rule that "[u]nless otherwise specified, the weight of a controlled substance set forth in the [drug quantity] table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." *Id.* § 2D1.1(c) n. *. Because nothing in application note 11 otherwise specifies, we conclude that that provision's initial reference to "the weight of the controlled substance" is most naturally read to mean the weight of the mixture or substance containing the controlled substance.

We note further that appellants' suggested alternative reading, which would trigger application note 11 if the weight of the actual controlled substance were unknown, produces highly anomalous results. Under that reading, if the actual weight of the hydromorphone were known (so that application note 11 would be inapplicable), dilaudid offenders would be sentenced according to a known or estimated weight of the dilaudid; but if the actual weight of the

---

vide conversion factors for all "other [controlled] substances." Without qualification, it then provides an "example" of how the tables are applied with respect to one such substance—oxymorphone. Nothing in the text of application note 10 suggests that the oxymorphone "example" fails to indicate the proper treatment for all other controlled substances listed in the drug equivalency tables.

**2.** The quoted language became effective on November 1, 1990, after appellants had been sentenced. Strictly speaking, therefore, it is inapplicable in this case. *See* 18 U.S.C. § 3553(a)(4) (instructing courts to consider the guidelines "in effect on the date the defendant is sentenced"). The relevant amendment to application note 11 purports merely to "clarif[y]" that provision, however. *See Guidelines* app. C, at C.173 (amendment 318) (Nov. 1, 1990). Insofar as the amendment merely clarifies, we may rely on it in interpreting the unamended guideline. *See, e.g., United States v. Cianscewski,* 894 F.2d 74,

78 (3d Cir.1990). Obviously, however, this court should not give retroactive effect to new provisions merely because their authors have deemed them to be clarifications of old provisions. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (describing general presumption that agencies have no power to promulgate retroactive rules); *see also Sullivan v. Finkelstein,* ─── U.S. ───, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part) ("Arguments based on subsequent legislative history ... should not be taken seriously...."). This is especially true in the criminal context, where the general presumption against retroactivity is fortified by the express command of the ex post facto clauses. We need not dwell on this concern, however: since neither side has objected to the other's citation of language from the amended version of application note 11, we assume that the parties accept the Commission's characterization of amendment 318 as a mere clarification, at least for purposes of this case.

hydromorphone were unknown (so that application note 11 would be applicable), dilaudid offenders would be sentenced according to an estimate of the weight of the hydromorphone, even if the actual weight of the dilaudid were known. Unable to imagine why the Sentencing Commission would have intended such a bizarre result, we reject appellants' approach. We conclude that in this case, the relevant question is whether the weight of the dilaudid, not the weight of the hydromorphone, was unknown.

Appellants contend that the weight of the dilaudid (and the weight of the hydromorphone) was "not ... known" for purposes of application note 11 because "the drugs themselves were never actually weighed." Appellants' Consolidated Brief at 18. In effect, they argue that sentencing according to the weight of the mixture or substance is permissible only if the mixture or substance is actually weighed.

We find nothing in the text of application note 11 suggesting that limitation. Application note 11 explains that calculating total weight according to an estimate of the per-unit weight of an actual controlled substance "provides a very conservative estimate of the total weight." *Guidelines* § 2D1.1 application note 11 n. *. The Sentencing Commission has given no hint that it intentionally underestimated the typical per-unit weights of actual controlled substances, however; the estimates are "very conservative" only because the guidelines, but for the uncertainty, would have required the weight of the entire mixture or substance to be considered. Moreover, application note 11 prohibits use of the per-unit estimates in the table "if any more reliable estimate of the total weight is available from case-specific information," and the amendment promulgating this language indicates that the "more reliable estimate" refers to a "more reliable estimate of the weight of the *mixture or substance* containing the controlled substance," *id.* app. C, at C.173 (amendment 318) (emphasis added). The amendment also deleted from the table controlled substances for which "more accurate weight estimates can be obtained from other sources." *Id.*

It is clear, therefore, that application note 11 was designed to address problems of uncertainty, not to undermine the preference that sentences be determined according to the weight of the mixture or substance, if possible. When the application note requires a calculation of total weight to be based on an estimated per-unit weight of the actual controlled substance, it simply reflects the Commission's judgment that the per-unit weight of the relevant mixture or substance cannot be estimated with sufficient precision so as to justify using the preferred approach.

The crucial question, then, is not whether the dilaudid pills were actually weighed, but whether the per-pill weight of dilaudid can be estimated with sufficient precision to justify calculating the total weight on that basis. If it can, then nothing in application note 11 requires the "very conservative," and otherwise disfavored, approach of sentencing according to an estimate of the total weight of hydromorphone. In this case, the estimate that appellants' dilaudid pills weighed about 90 milligrams per pill was supported by data from the Drug Enforcement Administration, from the *Physicians' Desk Reference*, and from the manufacturer of the pills, as McNeil himself pointed out to the district court. *See* Memorandum in Aid of Sentencing at 5–6 (No. CR–90–00132–06) (Sept. 20, 1990). Repeatedly, appellants have conceded that the estimate is accurate. *See, e.g., id.;* Memorandum in Aid of Sentencing at 4 (No. CR–90–00132–02) (Sept. 20, 1990) (Shabazz); Appellants' Consolidated Brief at 21. Given appellants' concession, we conclude that both the per-pill weight and the total weight of dilaudid were "known" for purposes of application note 11, and that appellants were properly sentenced according to the latter.

## III.

■ Appellants next contend that in calculating their sentences according to the weight of dilaudid, the district court violated 21 U.S.C. § 841(b)(1)(C). As discussed above, however, the district court's ap-

proach was required by section 2D1.1 of the sentencing guidelines, promulgated by the United States Sentencing Commission pursuant to an express grant of rulemaking authority. *See* 28 U.S.C. § 994(a)(1). We may set aside the guideline, therefore, only if it contravenes an "unambiguously expressed intent of Congress" or is unreasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

■ In pertinent part, section 841(b)(1)(C) provides that for distribution offenses involving "a controlled substance in schedule I or II except as provided in subparagraphs (A), (B), and (D)," the offender "shall be sentenced to a term of imprisonment of not more than 20 years." Hydromorphone is a schedule II controlled substance not provided for in subparagraphs (A), (B), or (D); by default, therefore, sentences for unlawful distribution of hydromorphone are provided under subparagraph (C).

We can discern no clearly expressed congressional intent in this provision that would forbid appellants' sentences, neither of which was more than five years.[3] To the contrary: we think it clear that Congress authorized sentences of up to twenty years for offenses involving distribution of *any* amount of hydromorphone, even a single dosage. Congress said absolutely nothing about how the sentence imposed should be tailored to the weight of the hydromorphone involved, if at all. That determination was left initially to the discretion of individual sentencing judges, and later to the expertise of the Sentencing Commission. It is precisely the sort of statutory "gap" that the Commission was entitled to fill, or at least narrow, in any reasonable manner. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83.

Appellants, however, seek to divine a controlling intent from subparagraphs (A) through (C) considered together. Suparagraphs (A) and (B) provide increased sentencing ranges for high-volume offenses involving eight specified controlled substances—heroin, cocaine, cocaine base, PCP, LSD, fentanyl, marijuana, and methamphetamine. For all of these substances, the applicable sentencing range depends on the weight of the mixture or substance containing the controlled substance. Thus, for example, distributing heroin carries a penalty of at least ten years if the mixture containing heroin weighs at least one kilogram, *see* 21 U.S.C. § 841(b)(1)(A)(i); between five and forty years if the mixture containing heroin weighs between 100 grams and one kilogram, *see id.* § 841(b)(1)(B)(i); and up to twenty years if the mixture containing heroin weighs under 100 grams, *see id.* § 841(b)(1)(C).[4]

Appellants argue that subparagraphs (A) and (B), by their negative implication, evidence a congressional intent that the weight of the mixture or substance be irrelevant with respect to all but the eight controlled substances for which they make it relevant. Read that broadly, subparagraphs (A) and (B) would qualify subparagraph (C), which by itself authorizes sentencing on any basis that the sentencing authority deems appropriate, as long as the sentence does not exceed 20 years.

Recently, in *Central States Motor Freight Bureau v. ICC*, 924 F.2d 1099 (D.C.Cir.1991), we rejected an argument that the negative implication of one provision unambiguously restricted a grant of authority that could otherwise be read into another provision. *See id.* at 1104–08. In *Central States*, the case for recognizing a negative implication was unusually strong: at issue was one grant of authority that

---

**3.** Shabazz was sentenced under the conspiracy statute, 18 U.S.C. § 371, not under the drug distribution statute. The conspiracy statute, however, authorizes sentences of up to five years—more than Shabazz received.

**4.** In the case of PCP and methamphetamine, the weight of the actual controlled substance, as well as the weight of the mixture or substance,

might trigger an increased sentencing range. *See* 21 U.S.C. § 841(b)(1)(A)(iv), (B)(iv) (PCP); *id.* § 841(b)(1)(A)(viii), (B)(viii) (methamphetamine). In the case of marijuana, the number of marijuana plants involved, as well as the weight of the mixture or substance containing marijuana, might trigger an increased range. *See id.* § 841(b)(1)(A)(vii), (B)(vii).

could have been subsumed entirely within another; thus, reading the narrower grant to be without negative implication rendered it merely precatory. *See id.* at 1112–13 (Silberman, J., dissenting).[5] Here, by contrast, the case for recognizing a negative implication is unusually weak. Appellants invite us to make two leaps of inference above and beyond the familiar *expressio unius est exclusio alterius:* from the proposition that for certain controlled substances Congress *required* consideration of the gross weight *for purposes of determining what statutory range is applicable,* appellants would have us conclude that for all other controlled substances Congress *forbade* (as opposed to simply not requiring) consideration of the gross weight *for purposes of determining an appropriate point within the applicable range.* We are aware of no "traditional tools of statutory construction," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, that would compel appellants' proposed reading. Therefore, we hold that section 2D1.1 of the guidelines, in requiring that appellants be sentenced according to the gross weight of the dilaudid, violates no unambiguously expressed congressional intent.

Finally, appellants contend that statutory ambiguity notwithstanding, the Sentencing Commission acted unreasonably in refusing to treat hydromorphone differently from the eight drugs for which the statute requires consideration of gross weight. They do not, we emphasize, argue that Congress acted unreasonably with respect to any of those eight drugs, a question we need not address here. *Cf. Marshall,* 908 F.2d at 1320–26 (upholding gross weight rule as applied to LSD under rational basis scrutiny) (6–5 decision). Because we can discern

no relevant distinction between hydromorphone and the eight drugs specifically addressed in 21 U.S.C. § 841(b)(1)(A) and (B), we hold that the Commission acted reasonably in treating hydromorphone no differently.

Appellants attempt to distinguish hydromorphone because it is (1) a schedule II controlled substance (2) pharmaceutically manufactured (3) in a form in which "the drug dealer has no control over the gross weight of the substance or mixture as one may have over drugs which are unlawfully manufactured." Appellants' Consolidated Brief at 9. We may reject the first two points summarily: of the eight controlled substances for which the statute requires consideration of gross weight, five of them appear in schedule II,[6] and three of them are pharmaceutically manufactured.[7]

As for the third point, appellants gloss over the fact that hydromorphone is available as a solution, butter, syrup, or powder, *see Physicians' Desk Reference* at 1141–43, any one of which a dealer could readily dilute. Insofar as appellants contend that the Commission acted unreasonably in not providing a different rule for dilaudid *tablets,* their argument fails to distinguish methamphetamine, which is pharmaceutically manufactured as a tablet, *see id.* at 513, and for which consideration of gross weight is required by statute, *see* 21 U.S.C. § 841(b)(1)(A)(viii), (B)(viii). Even ignoring that difficulty, however, appellants' argument cannot prevail.

Appellants point out that dealers of dilaudid tablets—unlike cocaine dealers, for example—cannot "cut" or dilute their product. They can, however, choose whether they want to sell tablets containing one, two, three, or four milligrams of hydromorphone. *See Physicians' Desk Reference* at

---

**5.** The provision we found arguably without negative implication permitted the Interstate Commerce Commission to exempt from regulation " 'transportation that is provided by a rail carrier as part of a continuous intermodal movement.' " 924 F.2d at 1102 (quoting 49 U.S.C. § 10505(f)). The broader grant of authority permitted the ICC to exempt from regulation any " 'matter related to a rail carrier' " providing transportation subject to ICC jurisdiction. *Id.* at 1101 (quoting 49 U.S.C. § 10505(a)).

**6.** *See* 21 C.F.R. § 1308.12(b)(4) (cocaine and cocaine base); *id.* § 1308.12(e)(3) (PCP); *id.* § 1308.12(c)(9) (fentanyl); *id.* § 1308.12(d)(2) (methamphetamine).

**7.** *See, e.g., Physicians' Desk Reference* at 1922 (cocaine); *id.* at 1119 (fentanyl); *id.* at 513 (methamphetamine).

1143. As with all other controlled substances, dealers "pick their poison." *Marshall*, 908 F.2d at 1325. Appellants argue that a dealer who chooses to distribute 400 dilaudid tablets each containing one milligram of hydromorphone is no more culpable than a dealer who chooses to distribute 100 dilaudid tablets each containing four milligrams of hydromorphone. By the same reasoning, however, a dealer who chooses to distribute four kilograms of 25% pure cocaine should be no more culpable than a dealer who chooses to distribute one kilogram of 100% pure cocaine. Congress could reasonably have endorsed this view. Instead, however, it chose the competing view. This, too, seems reasonable: by choosing to market a greater volume of a more diluted product, a dealer can reach— and therefore harm—more consumers. For present purposes, the only conceivable distinction between dilaudid tablets and cocaine is that the concentration of hydromorphone, but not of cocaine, is immediately apparent to the consumer. *See Physicians' Desk Reference* at 413. Thus, a dilaudid dealer, by switching from four-milligram tablets to one-milligram tablets, presumably cannot increase his profits the way a cocaine dealer can by diluting his 100% pure product by a factor of four. That distinction makes a difference, however, only if the gross-weight rule was intended to protect consumers of illegal drugs from being defrauded by unscrupulous dealers who would sell them a product more diluted than they have bargained for. Obviously, this is not a purpose of the rule.

Because we can imagine no relevant difference between pharmaceutically manufactured drugs like dilaudid and the eight controlled substances that Congress has expressly singled out for gross-weight treatment, we hold that the Sentencing Commission did not act unreasonably in also treating pharmaceuticals the same way.[8]

## IV.

Appellants' arguments are all without merit. The judgments of sentence are therefore

Affirmed.

**8.** We acknowledge that the reasoning we have used to justify the gross-weight treatment of hydromorphone is our own, not the Sentencing Commission's. Ordinarily, of course, we may uphold an agency rule only on the basis of reasoning given by the agency itself, because any agency action without reasoned explanation would be arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A). *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The Commission, however, believes itself exempt from this requirement because of its location "in the judicial branch," 28 U.S.C. § 991(a). *See* 51 Fed.Reg. 35,080 (Oct. 1, 1986) ("[T]he Administrative Procedure Act ...

[is] not applicable to the judicial branch."); *cf.* 5 U.S.C. § 551(1)(B) (exempting "the courts of the United States" from APA requirements). Assuming that the Commission is correct, the question remains whether appellants can seek invalidation of the guideline on the ground that the Commission failed to provide a "concise general statement of [its] basis and purpose," 5 U.S.C. § 553(c). *See* 28 U.S.C. § 994(x) (making 5 U.S.C. § 553 applicable to sentencing guidelines). We need not decide either of these issues, however, for appellants contend only that the guideline is inconsistent with the statute, not that the guideline, even if consistent, is unsupported by sufficiently reasoned explanation.