993 F.2d 1548
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard E. TAPERT, Defendant-Appellant.
 No. 92-1628.
 United States Court of Appeals, Sixth Circuit.
 May 19, 1993.
 
 Before: JONES and GUY, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant-Appellant Dr. Richard E. Tapert, D.O., appeals his conviction and sentence for violating federal controlled substances laws. For the reasons stated herein, we affirm.
 
 I.
 
 2
 This prosecution arose out of a grand jury investigation of Thomas Fredal, a registered pharmacist, and Fredal Pharmacy. Prior to initiating the grand jury investigation, diversion investigators of the Drug Enforcement Administration (DEA) obtained Fredal Pharmacy's prescription bundles for Schedule II, III and IV controlled substance which had been dispensed by Fredal Pharmacy between 1988 and October 1990. Upon reviewing the prescriptions, the investigators determined that a large percentage of the controlled substances prescriptions appeared to have been written or authorized by Tapert, a doctor of osteopathic medicine.
 
 
 3
 On October 22, 1990, a grand jury subpoena was issued to Tapert, directing him to produce certain patient files to the grand jury on October 23, 1990. Tapert appeared before the grand jury as directed. However, asserting his fifth amendment right against self-incrimination, he refused to produce the documents. The district court directed Tapert to return to the grand jury on November 6, 1990, at which time the issue of immunity would be addressed.
 
 
 4
 On November 6, 1990, the district court issued an order of immunity to Tapert, pursuant to 18 U.S.C. §§ 6002-6003 (1988). The order directed Tapert to produce the documents requested in the grand jury subpoena in exchange for immunity for the act of production and any testimony he gave concerning the authenticity of the documents, or any information directly or indirectly derived from such act and testimony.[1] Tapert complied with the order by turning the documents over to DEA Investigator Phillip Miller.
 
 
 5
 On March 29, 1991, Tapert was charged in a superseding indictment. Tapert, along with Charles Dunaway and Daniel Tapert (Daniel), were charged with conspiracy to possess with the intent to distribute and to distribute Schedule II, III and IV controlled substances, in contravention of 21 U.S.C. §§ 841(a)(1) (1988) and 846 (1988). In addition, Tapert was charged with fifteen counts of distributing controlled substances outside the usual course of professional practice and for no legitimate medical purpose, all in violation of Section 841(a)(1) and 18 U.S.C. § 2 (1988).
 
 
 6
 On June 21, 1991, Tapert filed a motion to dismiss the indictment. He argued that the prosecution was barred by the terms of a March 8, 1989 immunity agreement, entered into in relation to the investigation of Arthur Derrick. Derrick was charged with engaging in a continuing criminal enterprise for the distribution of cocaine. The agreement between the government and Tapert provided, in pertinent part, that the government would not prosecute Tapert "for any controlled substances or other criminal activity involving [Tapert and his family] and Arthur Derrick, members of his family or his organization." J.A. at 91.[2] Tapert contended that this present prosecution was barred because, he alleged, his co-Defendant in the instant case, Dunaway, was a member of the Derrick organization.
 
 
 7
 In the alternative, Tapert argued that the indictment should be dismissed because the prosecution was tainted by the government's use of patient records which he had produced to the grand jury pursuant to the November 6, 1990 court order. Specifically, Tapert argued that the government improperly used the contents of the records to secure the indictment against Tapert and to aid in its investigation.
 
 
 8
 A hearing on Tapert's motion to dismiss was held on November 6, 1991. Testimony at the hearing was limited to the question of whether Dunaway was a member of the Derrick organization. The testimony at the hearing revealed the following:
 
 
 9
 Derrick pled guilty to a three-count information, charging him with engaging in a continuing criminal enterprise and tax evasion between January 1985 and October 1987. Derrick testified that from approximately 1976 or 1977 to 1982, he gave Dunaway cocaine in exchange for pills. They made these exchanges hundreds of times over the five to six year period. In addition, Derrick said that Tapert gave Derrick prescriptions for drugs and that Tapert gave Dunaway prescriptions for drugs which Dunaway gave to Derrick.
 
 
 10
 Derrick testified that the following happened between 1985 and 1987: 1) he became involved with selling large quantities of cocaine; 2) Tapert held cocaine and money for him; and 3) Tapert and Daniel gave pills to him.
 
 
 11
 Derrick testified that he did not see Dunaway from 1982 to 1988 when he accidentally ran into him at Daniel's home. Derrick was delivering cocaine to Daniel while Dunaway was present. The two did not talk.
 
 
 12
 Richard Crock, the case agent in the Derrick investigation, also testified. Crock first began investigating Tapert in late 1987 or early 1988. The focus of his investigation, which led to Derrick's prosecution, was Derrick's wholesale distribution of cocaine. Other than Tapert's statements made during a debriefing pursuant to the immunity letter, Crock had no information that Derrick was trading cocaine for pills at any time.
 
 
 13
 Crock had referred Tapert to DEA diversion investigators for a debriefing concerning the illegal distribution of prescription drugs. At Tapert's debriefing, he told Investigator Karen Mysliwiec that he had given Derrick and Derrick's wife prescriptions for pills. Tapert also told Mysliwiec that it was a coincidence that he was giving Derrick illegal prescriptions at the same time that he, Tapert, was receiving cocaine from Derrick. According to Tapert, his illegal distribution of controlled substances to the Derricks was an aberration in his otherwise legitimate medical practice. Tapert made no mention of Dunaway at the debriefing.
 
 
 14
 On November 8, 1991, the district court denied Tapert's motion, finding that Dunaway was not part of the Derrick organization. In addition, the court found that even if Dunaway was part of the Derrick organization, the motion to dismiss the indictment would be denied because Tapert, by not telling the government about his dealings with Dunaway, failed to give full, truthful and complete information as was required under the March 8, 1989 agreement. The court further concluded that the government's prosecution was not tainted by any use of the content of Tapert's patient records in securing the indictment against Tapert.
 
 
 15
 On December 4, 1991, Tapert entered into a plea agreement with the government, pursuant to Rule 11 of the Federal Rules of Criminal Procedure. Tapert agreed to plead guilty to one count of the indictment, charging him with the illegal distribution of secobarbital. In addition, Tapert agreed to fully cooperate with the government. In exchange, the government agreed to move for a downward departure if Tapert's cooperation amounted to substantial assistance.
 
 
 16
 The plea agreement incorporated a set of sentencing guideline worksheets which were prepared by the government. An addendum to the worksheets identified all of the illegal distributions which the government contended comprised Tapert's relevant conduct. Based upon the distributions identified in the addendum, the government took the position that Tapert's base offense level was twenty-six. Tapert specifically reserved the right to dispute two issues relating to the plea agreement:
 
 
 17
 The addendum to the worksheets sets forth the total number of prescriptions and the total number of dosage units of controlled substances with regard to which the government believes that defendant acted outside the ordinary course of legitimate medical practice. Defendant reserves his right to dispute the following issues which relate to the computation of the appropriate guideline range: (1) whether some of the prescriptions identified on the addendum to the worksheets were issued within the ordinary course of legitimate medical practice; and (2) the weights to be utilized in converting the dosage units of controlled substances to their heroin equivalency when the specified amount of dosage units are known.
 
 
 18
 J.A. at 124.
 
 
 19
 The government, including the probation department, contended that the total weight of the pills or tablets, including both controlled and non-controlled ingredients, should be used to determine the heroin equivalents for purposes of calculating Tapert's base offense level. Tapert argued that only the weight of the controlled substance contained in each pill or tablet should be considered in computing his base offense level.
 
 
 20
 Tapert's sentencing hearing was held on April 30, 1992. At that time, the court rejected Tapert's argument by sentencing him in accordance with the probation department's recommendation. After figuring in Tapert's substantial assistance to the government reduction, Tapert was sentenced to forty-eight months of imprisonment.
 
 II.
 
 21
 Tapert first contends that the district court erred in denying his motion to dismiss the indictment based on his immunity agreement and his immunized testimony which he gave pursuant to a court order.[3]
 
 A.
 
 22
 With regard to the immunity agreement, we hold that the district court's finding that Tapert failed to give full, complete and truthful testimony concerning Dunaway's part of the Derrick organization is not clearly erroneous. United States v. Fitch, 964 F.2d 571, 574 (6th Cir.1992); see also United States v. Plummer, 941 F.2d 799, 803 (9th Cir.1991) (the interpretation of an informal immunity agreement, which is like a contract, is a factual determination which is reviewed under the clearly erroneous standard).
 
 
 23
 Tapert's immunity agreement provides that "[t]his letter will advise you of the agreement we have made with you for your full, truthful and complete de-briefing, grand jury testimony and testimony at trial, if necessary." J.A. at 91. According to the agents who debriefed Tapert, Tapert did not disclose that Dunaway was part of the Derrick organization or that he and/or Derrick were trading pills for drugs with Dunaway. Assuming, arguendo, that Dunaway was part of the Derrick organization, Tapert's failure to disclose this information violated his immunity agreement. As a result, the district court's finding in this regard is not clearly erroneous.
 
 B.
 
 24
 Tapert also contends that the indictment should be dismissed because the district court's November 6, 1990 order granting Tapert immunity for his act of producing patient records and any testimony authenticating those records was not complied with by the government. The issue Tapert raised before the district court was whether the prosecution was tainted by the government's use of the contents of patient records which he was compelled to produce pursuant to a district court order based on 18 U.S.C. § 6003. Specifically, Tapert argued that the government used information contained in the records to prove that the prescriptions were not issued in the ordinary course of legitimate medical practice, to refresh a witness' testimony, to continue its investigation, and to identify additional witnesses. Because Tapert's immunity did not cover the contents of the patient records, but rather the act of producing the records and any testimony authenticating the records, the district court held, citing United States v. Doe, 465 U.S. 605, 611-12 (1984), that the contents of the patient records were not protected.
 
 
 25
 On appeal, Tapert contends, pursuant to Kastigar v. United States, 406 U.S. 441 (1972), that the district court erred by not having the government prove at a hearing that all the evidence used to indict Tapert derived from sources independent of the immunized act. Tapert raises this argument for the first time on appeal.
 
 
 26
 This Court will not consider arguments raised for the first time on appeal absent exceptional circumstances or unless failure to consider the issue will result in a plain miscarriage of justice. See, e.g., United States v. Pickett, 941 F.2d 411, 415 (6th Cir.1991). We find that this case does not present exceptional circumstances or that there will be a miscarriage of justice by not considering this issue. Therefore, we decline to review this issue.
 
 III.
 
 27
 Tapert next challenges the sentencing scheme of the United States Sentencing Commission's Guidelines Manual, § 2D1.1 (1991) [hereinafter "U.S.S.G."], to the extent that it required the district court to use the gross weight of illegally distributed prescription drugs, rather than only the weight of the controlled substances contained in the drugs, to calculate his base offense level. Tapert argues that the gross weight approach to calculating a sentence range for distributors of prescription drugs is contrary to Congressional intent as expressed in 21 U.S.C. § 841. Tapert also argues that the gross weight approach violates due process because it imposes harsher sentences based on the weight of legal substances over which a trafficker lacks control.
 
 A.
 
 28
 Tapert first contends that the gross weight approach for calculating an appropriate base offense level, as set forth in U.S.S.G. § 2D1.1,[4] is contrary to the penalty provisions of 21 U.S.C. § 841. Specifically, he argues that, pursuant to Section 841, Congress expressed an intention to consider the entire weight of a "mixture or substance" only with regard to several enumerated drugs, see supra note 4, commonly referred to as "street drugs." The terms "mixture or substance" are part of subsections 841(b)(1)(A) and (B), the provisions which provide the penalties for distribution of street drugs. Subsections 841(b)(1)(C) and (D), which provide the penalties for pharmaceutical drug distribution, do not contain those terms. Tapert concludes, by negative implication, that Congress must have intended that the sentencing court employ the net weight of the active ingredients (i.e., controlled substance) of pharmaceuticals, rather than their gross weight, when calculating the base offense level because Congress did not specifically say to use the total weight.
 
 
 29
 A court may set aside a sentencing guideline only if it contravenes an unambiguously expressed intent of Congress or is unreasonable. See United States v. Shabazz, 933 F.2d 1029, 1035 (D.C.Cir.) (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-45 (1984)), cert. denied, 112 S.Ct. 431 (1991).
 
 
 30
 Several courts have rejected Tapert's argument or similar arguments. See Shabazz, 933 F.2d at 1036; United States v. Lazarchik, 924 F.2d 211, 214 (11th Cir.), cert. denied, 112 S.Ct. 96 (1991); United States v. Bayerle, 898 F.2d 28, 31-32 (4th Cir.), cert. denied, 111 S.Ct. 65 (1990).
 
 In Shabazz, the court stated:
 
 31
 Appellants invite us to make two leaps of inference above and beyond the familiar expressio unius est exclusio alterius: from the proposition that for certain controlled substances Congress required consideration of the gross weight for purposes of determining what statutory range is applicable, appellants would have us conclude that for all other controlled substances Congress forbade (as opposed to simply not requiring) consideration of the gross weight for purposes of determining an appropriate point within the applicable range. We are aware of no "traditional tools of statutory construction," Chevron, 467 U.S. at 843 n. 9 ... that would compel appellants' proposed reading. Therefore, we hold that section 2D1.1 of the guidelines, in requiring that appellants be sentenced according to the gross weight of dilaudid [a pharmaceutical drug], violates no unambiguously expressed congressional intent.
 
 933 F.2d at 1036. The court concluded:
 
 32
 Because we can imagine no relevant difference between pharmaceutically manufactured drugs like dilaudid and the eight controlled substances that Congress has expressly singled out for gross-weight treatment, we hold that the Sentencing Commission did not act unreasonably in also treating pharmaceuticals the same way.
 
 
 33
 Id. at 1037 (footnote omitted).
 
 
 34
 In Lazarchik, the Eleventh Circuit noted and held:
 
 
 35
 It is true that subsections 841(b)(1)(A) and (B), which provide penalties for distribution of 'street drugs', include the language 'mixture or substance containing a detectable amount of ...' while the provisions for pharmaceutical distribution do not. However, this does not imply a Congressional intent to measure pharmaceuticals and street drugs differently. A more careful reading of the statute shows that with regard to "street drugs", Congress varied the statutory maximum and minimum penalties by weight, and therefore it was necessary that the statute specify whether the weight of the entire mixture was included or only the weight of the pure substance. However, with regard to the illegal distribution of pharmaceuticals, Congress provided for a single statutory sentencing range for each Schedule, regardless of the amount of the substance distributed. Therefore, because no statutory penalty distinctions are made on the basis of weight for pharmaceuticals, there was no need to specify within the statute how pharmaceutical weights should be calculated. Accordingly, we find no merit in appellant's argument that this statute compels the use of net weights in calculating the heroin equivalency of pharmaceuticals under the Guidelines.
 
 
 36
 924 F.2d at 214 (footnotes omitted).
 
 
 37
 We find the rationales expressed in Shabazz and Lazarchik persuasive. We find it neither unreasonable nor contrary to Congressional intent for the Sentencing Commission to treat pharmaceuticals the same way as "street drugs" even though it is not required by Section 841. "It is entirely appropriate that the Sentencing Commission should choose to adopt the same method for computing the weight of pharmaceuticals that Congress chose for § 841(b)(1)(A)-(B) substances." Lazarchik, 924 F.2d at 214 n. 4. As a result, we reject this contention.
 
 B.
 
 38
 Tapert next contends that the gross weight approach in U.S.S.G. § 2D1.1 offends his Fifth Amendment due process rights. Tapert argues that the scheme violates notions of substantive due process because it treats equally a person convicted of illegally distributing controlled substances that have been diluted and a person convicted of selling the same weight-based quantity of "pure" controlled substances. Tapert also notes that in the context of prescription drugs, the gross weight scheme is unfair because the seller has no control over the composition of the ingredients.
 
 
 39
 Similar arguments have been rejected. See Chapman v. United States, 111 S.Ct. 1919, 1928-29 (1991) (LSD); Bayerle, 898 F.2d at 31-32 (pharmacological drugs); see also Shabazz, 933 F.2d at 1036-37 (pharmaceutical drugs).
 
 
 40
 In Chapman, the Court was faced with a question of whether the weight of a carrier (in that case, the carrier was blotter paper, a carrier commonly used to distribute LSD) could be used when computing the appropriate sentence for LSD distribution. The Court held "that the statute requires the weight of the carrier medium to be included when determining the appropriate sentence for trafficking in LSD, and this construction is neither a violation of due process, nor unconstitutionally vague." Id. at 1929.
 
 
 41
 The Supreme Court stated that when a person has been convicted, that person is eligible for whatever punishment is authorized by statute for his offense, "so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." Id. at 1927. The Court noted:
 
 
 42
 The penalty scheme set out in the Anti-Drug Abuse Act of 1986 is intended to punish severely large-volume drug traffickers at any level.... By measuring the quantity of drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity.
 
 
 43
 Id. at 1927-28. The Court held that the sentencing scheme "rational." Id. The Court also held that the sentencing scheme did not violate due process, even though distributors selling different numbers of doses of LSD, and therefore, with arguably different degrees of culpability, would be subject to the same minimum sentence because of choosing different carriers. Id.
 
 
 44
 In Bayerle, 898 F.2d at 31-32, the Fourth Circuit held that the Drug Equivalency Tables did not violate defendants due process rights even though defendant's sentencing was based on gross weight of pharmacological drugs. The court noted that the equivalency tables complained of were simply an extension of the gross weight scheme of 21 U.S.C. § 841(b)(1). Id. at 31. The court had previously upheld the gross weight scheme of Section 841(b)(1), finding that the equivalency tables were rationally related to the legislative goal of "sentencing criminals involved in the upper echelons of drug distribution more heavily than those less importantly involved."[5] United States v. Whitehead, 849 F.2d 849, 859-60 (4th Cir.), cert. denied, 488 U.S. 983 (1988).
 
 
 45
 In Shabazz, the court noted and rejected an argument similar to Tapert's:
 
 
 46
 Appellants point out that dealers of dilaudid tablets--unlike cocaine dealers, for example--cannot "cut" or dilute their product. They can, however, choose whether they want to sell tablets containing one, two, three, or four milligrams of hydromorphone. See Physicians' Desk Reference [1143 (45th ed. 1991) ]. As with all other controlled substances, dealers "pick their poison." [United States v.] Marshall, 908 F.2d [1312,] 1325 [ (7th Cir.1990) (en banc), aff'd sub nom. Chapman v. United States, 111 S.Ct. 1919 (1991) ].... For present purposes, the only conceivable distinction between dilaudid tablets and cocaine is that the concentration of hydromorphone, but not of cocaine, is immediately apparent to the consumer. See Physicians' Desk Reference at 413. Thus, a dilaudid dealer, by switching from four-milligram tablets to one-milligram tablets, presumably cannot increase his profits the way a cocaine dealer can by diluting his 100% pure product by a factor of four. That distinction makes a difference, however, only if the gross-weight rule was intended to protect consumers of illegal drugs from being defrauded by unscrupulous dealers who would sell them a product more diluted than they have bargained for. Obviously this is not a purpose of the rule.
 
 
 47
 933 F.2d at 1036-37.
 
 
 48
 Although the Shabazz court did not deal with whether the sentencing scheme violated due process because the guidelines treated similarly pharmaceutical drugs to "street drugs," we find the court's analysis persuasive. While pharmaceutical dealers may not be able to dilute their product, they are able to control the quantity distributed.[6] Moreover, the District of Columbia Circuit is correct when it states that dealers pick their poison. Furthermore, we note that the equivalency tables which use the gross weight schemes are simply an extension of the gross weight scheme of 21 U.S.C. § 841(b)(1) which have been upheld. Bayerle, 898 F.2d at 31. As a result, we find that the gross weight scheme of Section 2D1.1 is not based on any arbitrary distinction and is rationally related to the legislative goals of Section 841.
 
 
 49
 We hold that the gross weight scheme established by the Sentencing Commission, pursuant to 21 U.S.C. § 841(b)(1), is not violative of due process.
 
 IV.
 
 50
 Tapert next argues that the gross-weight scheme in Section 2D1.1 must be invalidated because the Sentencing Commission failed to comply with the requirements of the Administrative Procedure Act (APA). Tapert argues: 1) the scheme does not have a "concise and general statement" concerning its purpose; 2) the scheme adopted is arbitrary and capricious; and 3) the scheme contravenes the Sentencing Commission's enabling statute. The government counters, arguing that even assuming that Tapert's argument has any merit, this Court lacks authority to review the Commission's rulemaking.
 
 
 51
 The Sentencing Commission was established pursuant to the Sentencing Reform Act of 1984. 28 U.S.C. § 991(a) (1988). The Sentencing Reform Act provides that the Commission is part of the judicial branch. Id. In general, the APA is inapplicable to the judicial branch. 5 U.S.C. § 551(1)(B) (1988). A limited exception to this rule is embodied in 28 U.S.C. § 994(x) (1988) which provides:
 
 
 52
 The provisions of section 553 of title 5 relating to publication in the Federal Register and public hearing procedure, shall apply to the promulgation of [sentencing] guidelines pursuant to this section.[7]
 
 
 53
 In United States v. Lopez, 938 F.2d 1293, 1297 (D.C.Cir.1991), the D.C. Circuit considered the scope of the exception created by Section 994(x), and stated, "Applying the principle of inclusio unius est exclusio alterius, we conclude that by subjecting the promulgation of the Guidelines to this one section of the APA, Congress affirmed that the Commission's rulemaking was not subject to any other provision of the APA, including those for judicial review." Id.
 
 
 54
 As the court in Lopez observed, its decision is supported by the legislative history of the Act. Quoting from a Senate Committee Report, the court noted:
 
 
 55
 [Section 994(x) ] is an exception to the general inapplicability of the Administrative Procedure Act ... to the judicial branch....
 
 
 56
 ....
 
 
 57
 It is ... not intended that the guidelines be subject to appellate review under chapter 7 of title 5. There is ample provision for review of the guidelines by the Congress and the public; no additional review of the guidelines as a whole is either necessary or desirable.
 
 
 58
 Id. (quoting S.Rep. No. 225, 99th Cong., 1st Sess. 180-81 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3363-64 (footnote omitted)).
 
 
 59
 Based on the express language of Section 994 and consistent with the legislative intent as reflected in the Senate Report and in the reasoning in Lopez, we hold that this court lacks authority to review the Sentencing Commission's rulemaking process.
 
 V.
 
 60
 For the foregoing reasons, we affirm.
 
 
 
 [1]
 The order granting immunity provided, in pertinent part:
 IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the application heretofore made by Stephen J. Markman, United States Attorney for the Eastern District of Michigan, to grant immunity to Richard E. Tapert in accordance with Title 18, United States Code, Sections 6002-6003 be and the same hereby is allowed. It is further ORDERED that Richard E. Tapert produce and authenticate documents requested by the Grand Jury both before the Grand Jury and in the course of any trial which may be held in this district as a result of the Grand Jury investigation.
 IT IS FURTHER ORDERED that the act of production and testimony concerning the authenticity of documents as compelled under the order, or any information directly or indirectly derived from such act and testimony, shall not be used against Richard E. Tapert in any criminal case, except that the said Richard E. Tapert shall not be exempted by this order from prosecution for perjury, giving a false statement, or contempt while giving testimony as ordered herein.
 J.A. at 89-90 (emphasis added).
 
 
 [2]
 The text of the agreement provides, in full:
 This letter will advise you of the agreement we have made with you for your full, truthful and complete debriefing, grand jury testimony and testimony at trial, if necessary. The Government agrees, based on your full cooperation as indicated, that neither you, your wife nor your children will be prosecuted for any controlled substances or other criminal activity involving yourself and them and Arthur Derrick, members of his family or his organization, nor for any criminal conduct in which you were involved and which you have revealed to the Government.
 The Government will make no efforts to suspend your license to practice osteopathy or to prescribe and dispense controlled substances, nor will the Government provide information regarding these matters to any osteopathic or other licensing board or agency. However, your files are subject to review by DEA Diversion Investigators, without notice, for the two year period immediately following the date of this agreement.
 J.A. at 91 (emphasis added).
 
 
 [3]
 The government also contends that Tapert waived his right to appeal those determinations. Specifically, the government contends that Tapert foreclosed these specific appellate issues by pleading guilty. Because we find that the district court did not err in denying Tapert's motion to dismiss the indictment, we refrain from addressing the government's argument that Tapert waived his right to appeal these issues
 
 
 [4]
 Section 2D1.1(c) includes the following heading and discussion:
 Controlled Substances and Quantity* ...
 
 
 *
 Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance
 In addition, Application Note 10 of Section 2D1.1 provides, in part:
 The Commission has used the sentences provided in, and equivalences derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for the guideline sentences. The statute, however, provides direction only for the more common controlled substances, i.e., heroin, cocaine, PCP, methamphetamine, fentanyl, LSD and marihuana. The Drug Equivalency Tables set forth below provide conversion factors for other substances, which the Drug Quantity Table refers to as "equivalents" of these drugs. For example, one gram of a substance containing oxymorphone, a Schedule I opiate, is to be treated as the equivalent of five kilograms of marihuana in applying the Drug Quantity Table.
 
 
 [5]
 The "upper echelon" of drug distribution includes " 'trafficker(s) in a high place in the processing and distribution chain' and the 'managers of the retail level traffic' selling 'substantial street quantities.' " United States v. Whitehead, 849 F.2d 849, 859 (4th Cir.) (citing H.R.Rep. No. 845, 99th Cong., 2d Sess., pt. 1, at 11-12 (1986) (Report of the House Committee of the Judiciary)), cert. denied, 488 U.S. 983 (1988)
 
 
 [6]
 The government also argues that Tapert was able to determine the quantity of controlled substances actually contained in the prescription drugs he illegally distributed. It states:
 For example, Tapert does not dispute that he illegally distributed 610 dosage units of Percodan and 82 dosage units of Percocet-5. Both Percodan and Percocet-5 contain approximately 4.50 milligrams of oxycodone. See Physicians' Desk Reference at 929-30. Oxycodone, however, is contained in a variety of other prescription drugs in varying amount. Percodan-demi contains only 2.25 milligrams of oxycodone while Roxicodone Intensol contains 20 milligrams of oxycodone. Id. at 930, 1929. To the extent that Tapert controlled which of these products he would distribute, he was able to control the quantity of the controlled substance contained in each tablet or pill.
 Appellee's Br. at 19-20.
 
 
 [7]
 5 U.S.C. § 553 (1988) does not require an agency adopting rules to give exhaustive reasoning for adopting a particular rule; rather, the "explanation must simply enable a reviewing court 'to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.' " South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir.1983) (citations omitted), cert. denied, 465 U.S. 1080 (1984)