28 F.3d 1211
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Vito MASKELUMAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Henry BURGER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Thomas CROMLISH, Defendant-Appellant.
 Nos. 93-5544, 93-5557, 93-5558.
 United States Court of Appeals, Fourth Circuit.
 Submitted: March 15, 1994.
Decided: June 30, 1994.
 
 Appeals from the United States District Court for the Northern District of West Virginia, at Elkins. Robert Earl Maxwell, District Judge. (CR-92-187)
 Cynthia Santoro Gustke, Busch & Talbott, Elkins, West Virginia; Thomas M. Regan, Elkins, West Virginia; Cheryl Ann Wheeler, Elkins, West Virginia, for Appellants.
 William D. Wilmoth, United States Attorney, Sherry L. Muncy, Assistant United States Attorney, Wheeling, West Virginia, for Appellee.
 N.D.W.Va.
 AFFIRMED.
 Before MURNAGHAN and WILKINS, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Anthony Vito Maskelumas, Charles Henry Burger, and Robert Thomas Cromlish each entered a guilty plea to one count of conspiracy to acquire a controlled substance through fraud, 21 U.S.C.A. Secs. 846, 843(a)(3) (West Supp.1993). In sentencing each of them, the district court departed upward from the sentencing guideline range and imposed the statutory maximum of forty-eight months. They appeal their sentences. We affirm.
 
 
 2
 In July 1992, Burger and Cromlish, residents of Pennsylvania, acquired a blank prescription pad which had been stolen from a veterans hospital. According to Burger's version of the offense, the pad had been stolen by Maskelumas. Burger and Cromlish made numerous trips to pharmacies in West Virginia where they used false prescriptions to buy percocet (oxycodone) and dilaudid (hydromorphone). They kept records of which pharmacies they had used to avoid going to the same places repeatedly. They used most of the drugs themselves, but sold the rest or traded them for other drugs in Pittsburgh.
 
 
 3
 On August 4, 1992, Anthony Maskelumas left a drug treatment center in Pittsburgh where he was undergoing treatment as a condition of parole from his 1988 sentence for prescription fraud. Maskelumas joined Burger and Cromlish on August 8, and all three went to West Virginia, where they used forged prescriptions at two pharmacies. At the third stop, Maskelumas attempted to buy percocet and dilaudid while Burger and Cromlish waited outside in the car. Burger was the driver; Cromlish was passed out in the back seat. The pharmacist became suspicious and called the police. Maskelumas left the store without making a purchase, and an officer tried to stop the three outside the store. Burger drove away while the officer was reaching in the window with his gun drawn. The officer was knocked down and was slightly injured. The defendants were apprehended shortly afterward. Maskelumas told authorities that Burger and Cromlish had stolen the prescription pads from his residence while he was undergoing drug treatment.
 
 
 4
 Pursuant to Burger and Cromlish's plea agreements, twenty substantive charges against them were dismissed. Three substantive charges against Maskelumas pertaining to the prescription forgeries on August 8, 1992, were dismissed under his plea agreement.
 
 
 5
 A total of 1080 dilaudid tablets and 240 percocet tablets were obtained in the course of the offense. Under the applicable guideline section, U.S.S.G. Sec. 2D2.2,[1] the amount of drugs involved did not affect the calculation of the defendants' base offense levels. The probation officer recommended a base offense level of nine for Burger (which included an enhancement for the injury to the police officer), and a base offense level of six for both Cromlish and Maskelumas. Each defendant had a criminal history category of VI. Burger had twenty-three criminal history points, Maskelumas had twenty-two criminal history points, and Cromlish had thirteen criminal history points.
 
 
 6
 However, the district court gave notice that it was considering an upward departure because section 2D2.2 did not adequately consider the pattern of repeated forgeries of prescriptions, the large amount of drugs obtained, the elaborate scheme used to avoid detection, and the subsequent distribution of some of the drugs obtained. It also suggested that a departure under section 4A1.3, p.s., for inadequate criminal history might be justified for Burger and Maskelumas.
 
 
 7
 At a second hearing, the district court found by a preponderance of the evidence that Maskelumas provided the blank prescription pads to Burger and Cromlish, and that their use of the pads before he became directly involved was reasonably foreseeable to him. Maskelumas argued to the contrary, but did not testify or present evidence in support of his contention. For the reasons it had previously identified, the court departed by increasing the offense level to fifteen for each defendant. It imposed a sentence of forty-eight months in each case.
 
 
 8
 Departures are reviewed under the three-part test set out in United States v. Hummer, 916 F.2d 186, 192 (4th Cir.1990), cert. denied, 499 U.S. 970 (1991). First, the district court's decision that a relevant factor has not been adequately accounted for in the guideline is examined de novo. Second, the factual support in the record for the factor potentially warranting departure is reviewed for clear error. Third, the district court's determination that the identified factors are of sufficient importance that a departure should result is reviewed for abuse of discretion, as is the extent of the departure.
 
 
 9
 The first three factors identified by the district court--repeated use of false prescriptions, large amount of drugs involved, and subsequent distribution of some of the drugs--are all related. Taken singly and together, they constitute aggravating factors not adequately taken into account by section 2D2.2, which provides only a base offense level of eight, without any specific offense characteristics to aid in tailoring the offense level to the particular crime.
 
 
 10
 Burger argues that the Sentencing Commission must have considered and rejected the use of repeated incidents, the amount of drug involved, and subsequent conduct. Certainly, the Commission rejected these factors as considerations for the calculation of the base offense level in the typical prescription fraud offense. As a result, because they are not taken into account in section 2D2.2, they constitute aggravating factors which could warrant a departure in the appropriate case. An understated criminal history is identified in section 4A1.3 as an aggravating factor which may warrant a departure. The district court thus did not err in finding that there were factors present which might warrant a departure.
 
 
 11
 Maskelumas asserts on appeal that he was not involved with Burger and Cromlish before August 8, 1992, and specifically that he did not provide them with the stolen prescription pads. He made this argument in the district court, but did not testify or provide other evidence in support of it. The district court found by a preponderance of the evidence that Maskelumas was involved with Burger and Cromlish before August 8, and that their conduct was reasonably foreseeable to him, and thus was relevant to the computation of his sentence. This finding was not clearly erroneous. See U.S.S.G. Sec. 1B1.3(a)(1), (2). Moreover, the defendants do not dispute that they obtained a total of 1080 tablets of percocet and 240 tablets of dilaudid, or that some of these drugs were distributed by Burger and Cromlish in Pittsburgh. Maskelumas maintains that he was not involved in any illegal conduct apart from the events of August 8, 1992, but the court's finding that he was involved makes this conduct relevant to the computation of Maskelumas' sentence.
 
 
 12
 Burger had twenty-three criminal history points and Maskelumas had twenty-two points. Thus, both were well above the thirteen points needed for category VI. The court did not depart on this ground in Cromlish's case; it found that he was properly placed in category VI.
 
 
 13
 In deciding whether a departure should be made, the district court attached much importance to the defendants' persistent use of false prescriptions, noting that they made almost daily trips to West Virginia. The presentence report states that Maskelumas had been engaged in similar forgeries of prescriptions since 1983. The criminal history section of his presentence report reveals that he was paroled from a similar offense in April 1992 with the condition that he undergo in-patient drug treatment. In May 1992, before entering the treatment program, he incurred several new prescription fraud charges, and he left the program before completing it to join Burger and Cromlish in more of the same.
 
 
 14
 Because of the volume of Burger and Cromlish's use of the false prescriptions during the short time they had the prescription pads and Maskelumas' long history of such conduct, the district court did not abuse its discretion in deciding that the offense was sufficiently atypical that a departure should result. Further, because Burger and Maskelumas had twenty-three and twenty-two criminal history points, respectively, a departure on this ground was clearly warranted in their cases.
 
 
 15
 Finally, the extent of the departure was not unreasonable. If the defendants' base offense levels had been computed under guideline section 2D1.1(c), the Drug Table, using the gross weight of the tablets, their base offense levels would have been much higher. Therefore, the district court did not abuse its discretion in raising the offense level to fifteen.[2]
 
 
 16
 The judgment of the district court is therefore affirmed in each case. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED
 
 
 [1]
 United States Sentencing Commission, Guidelines Manual (Nov.1992)
 
 
 [2]
 Under United States v. Bayerle, 898 F.2d 28, 31 (4th Cir.), cert. denied, 498 U.S. 819 (1990), the gross weight of prescription drugs in pill or tablet form should be used to calculate the offense level, not the weight of the drug alone. A dilaudid tablet weighs approximately 90 milligrams. See United States v. Crowell, 9 F.3d 1452, 1453 (9th Cir.1993); United States v. Shabazz, 933 F.2d 1029, 1034 (D.C.Cir.), cert. denied, 60 U.S.L.W. 3359 (U.S.1991); United States v. Lazarchik, 924 F.2d 211, 212 (11th Cir.), cert. denied, 60 U.S.L.W. 3259 (U.S.1991). A percocet tablet weighs approximately 55 milligrams. See Lazarchik, 924 F.2d at 212 (Tylox and Percodan). Using these weights, the pills obtained by the defendants are the equivalent of 837 kilograms of marijuana, or base offense level thirty (700-1000 kg marijuana)