**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steven THOMPSON, Defendant–**
**Appellant.**

No. 02–5846.

United States Court of Appeals,
Sixth Circuit.

Jan. 21, 2004.

trial court erred in calculating drug quantity for purposes of sentencing by converting the amount of tincture of iodine purchased to the amount of methamphetamine that could be manufactured by the iodine. Because the court finds sufficient evidence was presented at sentencing as to the average yield of the methamphetamine laboratory, it affirms the decision of the trial court.

## FACTUAL BACKGROUND

On July 28, 2000, co-defendant Patrick Scott Monday purchased one gallon of seven percent tincture of iodine from a farm co-op. On August 17, 2000, Monday and the defendant went back to the same co-op and purchased two pints of seven percent iodine tincture. Both purchases were caught on videotape. The next day, officers went to Monday's home and found Monday, the defendant, and their girlfriends on the property. With Monday's consent, the officers searched the home and garage and found components of a methamphetamine lab and several liquids which tested positive for methamphetamine. A car driven by the defendant was in the garage and items used to make methamphetamine were also found in the car.

On February 27, 2001, a grand jury returned a nine-count indictment charging defendant and seven others with numerous methamphetamine offenses. After arraignment and negotiations, defendant pled guilty to an Information charging him with violating 21 U.S.C. § 846, attempt to violate 21 U.S.C. § 841(a)(1) and (b)(1)(c). Prior to accepting defendant's plea, the court informed the defendant that the statutory penalty was zero to twenty years of

Paul W. Laymon, Jr., Asst. U.S. Attorney, U.S. Attorney's Office, Chattanooga, TN, for Plaintiff–Appellee.

Charles P. Dupree, Chattanooga, TN, for Defendant–Appellant.

BEFORE: SILER and COOK, Circuit Judges, and BERTELSMAN,[*] District Judge.

PER CURIAM.

In this appeal, Steven Thompson seeks reversal of the district court's judgment, sentencing him to seventy (70) months imprisonment. Thompson contends that the

---

[*] The Hon. William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

imprisonment. Defendant informed the court he was aware of the statutory penalty and he wished to plead guilty.

At the sentencing hearing, Special Agent Bryan Freeman with the Tennessee Bureau of Investigation testified that he reviewed the videotape of Monday purchasing one gallon of iodine tincture, and defendant and Monday purchasing two pints of the tincture of iodine from a farm co-op. He also testified that, with Monday and defendant's consent, he searched the garage at Monday's house and found components of a clandestine methamphetamine laboratory. Some of the components were inside a car parked in the garage that was owned by defendant's brother, but which had been driven by the defendant for the last several days. He testified that the items found in the car included a large five-gallon bottle with a plastic hose attached to it, a 2000–milliliter flask, coffee filters with red material that looked like red phosphorous in them, and a box containing two muriatic acid gallon jugs that had been altered, taped together with duct tape and had a tube coming out of them. In the garage, the officer found more plastic tubing with a reddish brown stain in it, several jars and bottles with mixed liquid that were later analyzed as being positive for methamphetamine, a trash can with numerous empty bottles and containers, duct tape, and bottles of iodine tincture and hydrogen peroxide. Officer Freeman also testified to evidence demonstrating that the defendant had access to pseudoephedrine, another precursor chemical.

Co-conspirator Monday also testified at the sentencing hearing. Monday testified that he and the defendant made methamphetamine at Monday's home after the iod-ine purchases of July 28 and August 17, 2000. Monday admitted that he had testified at his own trial that he did not make any methamphetamine with the iodine, but was testifying now because he was seeking a Rule 35 motion for his cooperation.

James Emberton, convicted and serving twenty years for methamphetamine offenses, also testified at the sentencing hearing. He testified that he had been involved in manufacturing methamphetamine since 1998 and had cooked many pounds of the drug. He stated he had used seven percent tincture of iodine to make methamphetamine. He testified that mixing the iodine with hydrogen peroxide produced crystal iodine, which was needed to make methamphetamine. From a gallon of seven percent tincture of iodine, he could produce about one pound of crystal iodine. One pound of crystal iodine mixed with other chemicals generally yielded half a pound of methamphetamine. He testified that the yield would depend on how good one was at "cooking" the mixture. He has seen people take the correct chemicals and not yield any methamphetamine. Emberton admitted that he taught the defendant's brother how to cook methamphetamine and that the defendant was present twice during this process.

David Shelton, Special Agent with the DEA, also testified at the sentencing hearing[1] with regard to his expertise in methamphetamine investigations. Officer Shelton testified that a gallon of the iodine tincture, when treated, would generally produce a pound of iodine crystal. Officer Shelton further testified that when the crystal was mixed with other chemicals and "cooked" it generally produced a yield

1. Defendant objected to Officer Shelton's testimony based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendant has not raised a *Daubert* argument in this appeal and, therefore, it is not being addressed.

of fifty percent. Thus, a pound of iodine would result in a yield of one-half pound of methamphetamine. He admitted that he had seen some situations where no yield was produced and instead the result was a chemical mess. Shelton did not investigate this matter and was only testifying to general yields based on his experience with methamphetamine investigations.

The defendant also testified at the sentencing hearing. He stated that he did not make any methamphetamine from the iodine he purchased. He admitted being a methamphetamine user, but stated he has never been successful at "cooking" it.

The trial court found that, based upon the proof presented at the hearing and the testimony of witnesses at the co-defendants' trials, it believed the defendant was, in fact, producing methamphetamine. The court found the testimony at the sentencing hearing established that a fifty-percent yield was conservative. Given the evidence that defendant was involved in using one and one-fourth gallons of iodine, the court found it reasonable to assume a yield of fifty percent. Therefore, the trial court held that the amount contained in the presentence report, 226.8 grams of methamphetamine, although low, would be found correct. The court found defendant's sentencing range to be between 63–78 months and sentenced defendant to 70 months imprisonment.

## DISCUSSION

The Court of Appeals reviews a sentencing court's determination of drug quantity for clear error. *United States v. Treadway*, 328 F.3d 878, 883 (6ᵗʰ Cir.), *cert.*

*denied*, —— U.S. ——, 124 S.Ct. 166, 157 L.Ed.2d 109 (2003); *United States v. Campbell*, 317 F.3d 597, 604 (6ᵗʰ Cir.2003). The trial court's estimate of the drug quantity will not be found to be clearly erroneous if the approximation is supported by competent evidence in the record. *Id. See also Campbell v. United States*, 28 Fed.Appx. 365, 367 (6ᵗʰ Cir. 2001), *cert. denied*, 537 U.S. 863, 123 S.Ct. 248, 154 L.Ed.2d 105 (2002).

Where, as here, no drugs are seized, the sentencing court must approximate the quantity of drugs to be charged to the defendant. U.S.S.G. § 2D1.1, application note 12.[2] The Sixth Circuit has held that "when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." *Treadway*, 328 F.3d at 885 (*quoting United States v. Walton*, 908 F.2d 1289, 1202 (6ᵗʰ Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)). If the exact amount cannot be determined, the court's estimate will be sufficient as long as a preponderance of the evidence supports that estimate. *Campbell*, 317 F.3d at 604.

Here, appellant argues the district court erred in finding drug quantity without any evidence of his capability to manufacture methamphetamine. This court, however, has held that it is not necessary to consider the experience of the specific cook in determining drug quantity. *United States v. Mahaffey*, 53 F.3d 128, 132–33 (6ᵗʰ Cir. 1995); *United States v. Pavlik*, Nos. 93–2494, 94–1132, 94–1189, 94–1191, 1995 WL 59227, at **7–8 (6ᵗʰ Cir. Feb.13, 1995), *cert.*

**2.** Application note 12 to U.S.S.G. § 2D1.1. states, in part, "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size and capability of the laboratory involved."

*denied,* 516 U.S. 874, 116 S.Ct. 199, 133 L.Ed.2d 133 (1995).

Further, even if evidence of defendant's experience at cooking methamphetamine were required, the court finds ample evidence was presented as to defendant's "cooking" abilities. Mr. Monday testified that he had witnessed the defendant making methamphetamine and had seen a shoe box in the defendant's possession that contained coffee filters, used to cap off a cook, that were filled with methamphetamine, the product of a cook. Mr. Monday further testified that he had purchased methamphetamine from the defendant and that he helped the defendant shake the drug out of the coffee filters so that they could use it. Mr. Monday's testimony is sufficient evidence that defendant was not a novice cook. Accordingly, this argument lacks merit.

Defendant also argues that the district court erred in determining drug quantity without any first-hand testimony of the capacity of the laboratory in question. This court has made it clear that "it is incumbent upon the government to prove that laboratories of comparable size and capability were utilized if it sought to rely on [the yield of another laboratory]." *Mahaffey,* 53 F.3d at 132–33. Here, the government did not present direct evidence of the yield capability of the methamphetamine laboratory involved. Instead, the government relied on the testimony of the expert DEA agent and former methamphetamine cook as to the general yield of methamphetamine from a pound of iodine crystals. Therefore, before the district court could make a proper determination of drug quantity, it must have had some evidence that the laboratories referenced by the witnesses were of comparable size and capability to the one used by the defendant.

In the case at bar, the trial court accepted the testimony of both an expert DEA agent with extensive knowledge of methamphetamine labs and the "cooking" method used in this case, as well as the testimony of a former methamphetamine cook. Both witnesses testified that fifty percent (50%) was a conservative average yield of methamphetamine from a pound of iodine crystals. Although neither of these witnesses had first-hand knowledge of the lab in question, Officer Freeman provided first-hand testimony of the equipment seized at Monday's garage and in the defendant's car that evidenced a clandestine methamphetamine laboratory. DEA Agent Shelton then testified that clandestine laboratories conservatively yield fifty percent (50%) methamphetamine from crystal iodine.

This court has previously found that testimony of an expert as to general yields is sufficient to establish yield in a specific case where evidence of the equipment and methodology used were also presented. *See United States v. Oldham,* 13 Fed. Appx. 221, 228 (6th Cir.2001), *cert. denied,* 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001); *Pavlik,* 1995 WL 59227, at **7–8.

In *Oldham,* this court considered the testimony of a DEA agent who testified to typical yields of methamphetamine from 1000 tablets of pseudoephedrine and offered a range from 53.2 grams to 106.4 grams. A forensic chemist also testified and stated that given the Oldhams' equipment and experience they could have reasonably produced 104 grams, which was fifty percent of the maximum theoretical yield of 209.8 grams. The trial court adopted the DEA agent's lowest estimate. The court of appeals found that the district court did not err in attributing to the defendants 53.2 grams of methamphetamine. Although the DEA agent did not

have first-hand knowledge of the defendants' lab, the court did have testimony from the forensic chemist regarding the capacity of the defendants' equipment in making its determination.

In *Pavlik*, the trial court accepted the testimony of two expert witnesses who stated it was reasonable to expect a fifty-percent yield from a precursor chemical in a clandestine laboratory. Both experts conducted experiments to determine the yield using the exact formula used by the defendants. One of the experts testified that it "was not unreasonable to expect a 50% yield from clandestine laboratories of the type used in this case." 1995 WL 59227, at *7. Thus, there was some evidence that at least one of the experts had knowledge of the laboratory in question.

Similarly to *Oldham* and *Pavlik*, the government in the case at bar presented evidence of the laboratory in question. Officer Freeman testified as to the equipment and chemicals seized at the site and described the laboratory found. Therefore, there was evidence in the record of the laboratory in question, and the district court's reliance on expert testimony as to average yields of clandestine laboratories utilizing the same methodology and equipment as the defendant was proper.

Here, as discussed above, reliable evidence supports the district court's findings that the defendant was responsible for 226.8 grams. In fact, the evidence supports a finding that the drug quantity was much higher than 226.8 grams, as the presentence report took into consideration only the purchase of one gallon of tincture of iodine and not the additional two pints.

Accordingly, we **AFFIRM** the trial court's judgment.